# United States Court of Appeals

## For the First Circuit

No. 07-1588

ALEXANDRE ARONOV,

Plaintiff, Appellee,

v.

MICHAEL CHERTOFF, ET AL.,

Defendants, Appellants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nancy Gertner, U.S. District Judge]

Before

Lynch, Chief Judge,
Tashima, Circuit Judge,[*]
and Lipez, Circuit Judge.

Surell Brady, Trial Attorney, Office of Immigration
Litigation, Civil Division, U.S. Department of Justice, with whom
Peter D. Keisler, Assistant Attorney General, Thomas H. Dupree,
Jr., Deputy Assistant Attorney General, and Donald E. Keener,
Deputy Director, were on brief, for appellant.
Gregory Romanovsky, with whom the Law Office of Boris B.
Maiden was on brief, for appellee.

August 1, 2008

---

[*]Of the Ninth Circuit, sitting by designation.

**LIPEZ, <u>Circuit Judge</u>**.  We address in this case whether appellee Alexandre Aronov is entitled to attorney's fees from the government under the Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412.  The act provides that a court shall award fees and expenses to a prevailing party in a civil action against the United States unless the court finds that the position of the government was substantially justified or that other circumstances make an award unjust.

Aronov filed the action in this case to force the government to act on his long-pending application for naturalization.  The district court awarded him attorney's fees under the EAJA on the grounds that he was the prevailing party in the litigation and that the pre-litigation position taken by the government was not substantially justified.  We affirm the district court's award.

## I.

A native of Russia and a permanent resident of the United States since 2001, Aronov applied for naturalization with the Vermont Service Center of the United States Citizenship and Immigration Services ("USCIS") on May 22, 2004.  After initial processing and completion of the required fingerprint check, Aronov's case was forward to the Boston USCIS office.  Pursuant to 8 U.S.C. § 1446(b) and 8 C.F.R. § 335.2(a), Aronov was interviewed on February 14, 2005 regarding his application.  However, as the

government acknowledges, the agency's interview with Aronov was premature. The agency's own regulation dictates that an initial examination should be undertaken only after an applicant's full background check has been completed. See 8 C.F.R. § 335.2(b) ("The Service will notify applicants for naturalization to appear before a Service officer for initial examination on the naturalization application only after the Service has received a definitive response from the Federal Bureau of Investigation that a full criminal background check of an applicant has been completed."). The government has not explained why it did not follow its regulation in this case.

At the time of the interview, Aronov was informed that his application could not be approved until additional security checks were completed. After hearing nothing from the USCIS for more than a year, Aronov received a letter from the agency on March 23, 2006 informing him that his application was being actively processed, but that additional review was required. The notice also instructed Aronov to contact USCIS if he did not receive a decision within six months of the date of the notice.

On August 28, 2006, more than eighteen months after being interviewed by the agency, Aronov filed an action in the district court under 8 U.S.C. § 1447(b), requesting that the court grant his application for naturalization or, alternatively, remand his

application with instructions to the agency to adjudicate it.[1] Five weeks later, on October 6, the government and Aronov filed a Joint Motion for Remand Pursuant to 8 U.S.C. § 1447(b). In full, the joint motion read:

> Pursuant to 8 U.S.C. § 1447(b), the parties in this action, plaintiff . . . and defendants Michael Chertoff, Secretary of the United States Department of Homeland Security, et al., hereby jointly move this Honorable Court to remand this matter to the USCIS, so that [it] can grant plaintiff's application for naturalization, and schedule plaintiff's oath ceremony for no later than November 8, 2006. In support of this motion, the parties state as follows:
>
> 1. On or about August 28, 2006, plaintiff Alexandre Aronov filed this action.
> 2. Since that date, USCIS has completed its review of plaintiff's application for naturalization and, if jurisdiction is returned to the agency, would grant the application and schedule plaintiff's oath ceremony for no later than November 8, 2006.
> 3. The governing statute, 8 U.S.C. § 1447(b), provides that, in cases in which the agency has failed to render a decision on an

---

[1] 8 U.S.C. § 1447(b) reads:

> If there is a failure to make a determination under section 1446 of this title [to grant or deny the naturalization application] before the end of the 120-day period after the date on which the examination is conducted . . . , the applicant may apply to the United States district court for the district in which the applicant resides for a hearing on the matter. Such court has jurisdiction over the matter and may either determine the matter or remand the matter, with appropriate instructions, to the [USCIS] to determine the matter.

> application for naturalization within 120 days of the examination of the applicant, the applicant may file suit in district court requesting to adjudicate the application and "[s]uch court has jurisdiction over the matter and may either determine the matter or remand the matter, with appropriate instructions, to the Service to determine the matter."
>
> Wherefore, with good cause having been shown, the parties respectfully request that this Court remand this matter to USCIS so that it can grant plaintiff's application for naturalization and schedule plaintiff for an oath ceremony for no later than November 8, 2006.

On October 12, 2006, the court entered an electronic order granting the motion and the remand. The docket text for the remand order states: "Judge Nancy Gertner: Electronic ORDER entered granting 3 Joint Motion to Remand to US Citizenship and Immigration Services."[2] Aronov was sworn in as a U.S. citizen on November 8, 2006.

On November 28, 2006, Aronov filed an application for attorney's fees pursuant to the EAJA. The statute provides:

> Except as otherwise specifically provided by statute, a court shall award to a prevailing party other than the United States fees and other expenses, in addition to any costs awarded pursuant to subsection (a), incurred by that party in any civil action (other than cases sounding in tort), including proceedings for judicial review of agency action, brought by or against the United States in any court having jurisdiction of that action, unless the court finds that the position of the United

---

[2] The "3" references the previously submitted joint remand motion.

States was substantially justified or that special circumstances make an award unjust.

28 U.S.C. § 2412(d)(1)(A). The government opposed the application, asserting that Aronov was not a prevailing party in the litigation under the test established in Buckhannon Board and Care Home, Inc. v. West Virginia Department of Health and Human Resources, 532 U.S. 598 (2001), and that the government's position regarding his application was substantially justified. The district court agreed with Aronov and ordered the government to pay him $4,270.94 in attorney's fees and costs. The government appeals this decision.

## II.

Although parties are ordinarily required, win or lose, to bear their own attorney's fees, see, e.g., Alyeska Pipeline Serv. Co. v. Wilderness Soc'y, 421 U.S. 240, 247 (1975), a number of exceptions to this default rule have been adopted by statute. One such exception, the EAJA, authorizes the award of attorney's fees and costs to a litigant who has brought a civil suit against the United States if (1) she is the prevailing party in the matter; (2) the government fails to show that its position was substantially justified; and (3) no special circumstances would make such an award unjust. 28 U.S.C. § 2412(d)(1)(A); see also Schock v. United States, 254 F.3d 1, 4 (1st Cir. 2001). By offering qualifying litigants attorney's fees and other expenses, the EAJA seeks "to remove economic deterrents to parties who seek review of unreasonable government action." Schock, 254 F.3d at 4.

-6-

We review the district court's decision to grant or deny a fee application under the EAJA for abuse of discretion, id., "mindful that the district court has an 'intimate knowledge of the nuances of the underlying case,'" New England Regional Council of Carpenters v. Kinton, 284 F.3d 9, 30 (1st Cir. 2002) (quoting Gay Officers Action League v. Puerto Rico, 247 F.3d 288, 292 (1st Cir. 2001)). "Such deference is particularly appropriate where, as here, the correctness of the court's decision depends in large part on the proper characterization of its own statements." Id. We apply this standard to both the prevailing party and substantial justification determinations. Pierce v. Underwood, 487 U.S. 552, 558-63 (1988) (substantial justification); McDonald v. Secretary of HHS, 884 F.2d 1468 (1st Cir. 1989) (prevailing party). An error of law is always an abuse of discretion. Rosario-Urdaz v. Rivera-Hernandez, 350 F.3d 219, 221 (1st Cir. 2003).

## A. Prevailing Party

### 1. The District Court's Decision

The district court began its attorney's fees analysis by addressing whether Aronov was a prevailing party under the EAJA. Invoking the Supreme Court's decision in Buckhannon, the district court found that the first requirement of the prevailing party standard -- whether there was "a material alteration of the legal relationship of the parties" -- was indisputably met because Aronov's status had changed from legal permanent resident to U.S.

-7-

citizen. The government does not dispute that this requirement has been satisfied.

Proceeding to the second element of the test -- whether there was a "judicial imprimatur[3] on the change" in status -- the court rejected the government's assertion that the imprimatur requirement had not been met here because the agency had acted voluntarily to grant Aronov's naturalization application. Instead, the court concluded that the remand order satisfied the second element set forth in Buckhannon because the order effectuated the change in legal status that Aronov had sought. The court indicated that the remand did not merely return jurisdiction to USCIS. It also mandated the agency's compliance with a November 8, 2006 deadline for granting Aronov's naturalization. The court noted that "[w]here the government in Buckhannon took its conciliatory action purely voluntarily, and took on no further duties in the dismissal, the government here was granted not a dismissal, but a remand to the agency conditional on the granting of plaintiff's naturalization action by November 8, 2006." (emphasis in original). It asserted, therefore, that "[h]ad the naturalization not so occurred, the parties might very well be back in front of this court litigating a contempt action. This is far more than a catalyst theory -- it was an order of the Court."

_____

[3] Black's Law Dictionary defines "imprimatur" as "a grant of approval; commendatory license or sanction." (8th ed. 2004).

2. <u>Buckhannon</u>

The issue in <u>Buckhannon</u> was whether a legislative change that effectively awarded petitioner its sought-after relief could provide the basis for a statutory fee award.[4] The plaintiff was an operator of assisted living homes who failed a state fire inspection because some of the residents of plaintiff's homes were not capable of "self-preservation," as defined by West Virginia law. On behalf of itself and other parties similarly situated, the home operator brought suit against the state, two state agencies, and several individuals, seeking injunctive and declaratory relief to the effect that the "self-preservation" requirement violated provisions of the Fair Housing Amendments Act of 1988 ("FHAA") and the Americans with Disabilities Act of 1990 ("ADA"). Before the federal district court decided the issue, the West Virginia legislature eliminated the "self-preservation" requirement by statute. The court subsequently granted the defendants' motion to dismiss the case.

---

[4] Although the Supreme Court in <u>Buckhannon</u> interpreted the fee-shifting provisions of the Fair Housing Amendments Act of 1988 ("FHAA"), 42 U.S.C. §§ 3601-3631, and the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12101-12213, "the principles underlying [its] holding [we]re broadly stated and [] not statute-specific." <u>Doe</u> v. <u>Boston Pub. Schs.</u>, 358 F.3d 20, 25 (1st Cir. 2004). Accordingly, we have held that the Supreme Court's reasoning in "<u>Buckhannon</u> is presumed to apply generally to all fee-shifting statutes that use the 'prevailing party' terminology." <u>Smith</u> v. <u>Fitchburg Pub. Schs.</u>, 401 F.3d 16, 22 n.8 (1st Cir. 2005) (quoting <u>Doe</u>, 358 F.3d at 25). The parties do not dispute the applicability of <u>Buckhannon</u> in this case.

The plaintiffs filed an application for attorney's fees under the FHAA and the ADA, which was denied by both the district court and the Fourth Circuit. The Supreme Court affirmed. The Court held that petitioner could not obtain a fee award in the matter because the legal change had not been judicially sanctioned by a court. Buckhannon, 532 U.S. at 605 ("[D]efendant's voluntary change in conduct, although perhaps accomplishing what the plaintiff sought to achieve by the lawsuit, lack[ed] the necessary judicial imprimatur."). The Court explicitly rejected the notion that a party is entitled to attorney's fees simply because the underlying litigation triggered her sought-after relief -- the so-called "catalyst theory." Id. It noted that previously it had "only awarded attorney's fees where the plaintiff ha[d] received a judgment on the merits or obtained a court-ordered consent decree," but not "where the plaintiff ha[d] secured the reversal of a directed verdict, or acquired a judicial pronouncement that the defendant ha[d] violated the Constitution unaccompanied by judicial relief," id. at 605-06 (internal citation and quotation marks omitted). A private settlement not incorporated into a court order does not confer prevailing party status. See id. at 606 ("Never have we awarded attorney's fees for a nonjudicial alteration of actual circumstances.") (emphasis added) (internal quotation omitted).

3.  Smith v. Fitchburg Public Schools

As a circuit, we have applied Buckhannon in a number of cases, see Smith v. Fitchburg Public Schools, 401 F.3d 16, 22 (1st Cir. 2005) (applying the Supreme Court's decision in the context of an action under the Individuals with Disabilities Education Act ("IDEA")); Doe v. Boston Public Schools, 358 F.3d 20, 22-26 (1st Cir. 2004) (similar analysis); Kinton, 284 F.3d at 30 (declining to award attorney's fees because the district court had not entered any order "compelling, or even leading to" the plaintiff receiving the relief it had requested), each time evaluating the specific facts of the case to determine whether the court's conduct was sufficient to "provide the necessary judicial imprimatur on the change in the legal relationship between the parties," Smith, 401 F.3d at 23 (citation omitted).

The government relies in particular on our Smith decision.  There, the parents of a disabled child initiated a proceeding under the IDEA against the Fitchburg Public Schools, seeking special education services for their child.  After several pre-hearing orders by a hearing officer of the Bureau of Special Education Appeals ("BSEA"), the entity in charge of overseeing the proceeding, the parties reached a private settlement that provided the plaintiffs all of the relief they had sought.  The plaintiffs subsequently filed an action in the district court seeking to recover attorney's fees pursuant to the IDEA.  They argued that the

-11-

orders of the BSEA, which required the school district to take certain actions and set deadlines for those actions, served as the necessary "judicial imprimatur" to grant them "prevailing party" status. Id. at 22.

After recognizing that the administrative relief was not in the form of a consent decree or a final judgment on the merits, and that the plaintiffs had not argued that the administrative orders were functionally equivalent to a consent decree, we addressed in Smith whether the facts of the case generally met the two required elements of Buckhannon.[5] Acknowledging that the plaintiffs had achieved a material change in the parties' relationship -- thereby satisfying the first prong of Buckhannon, we rejected the plaintiffs' claim for attorney's fees on the ground that the BSEA orders had not provided sufficient "judicial imprimatur" on the relief obtained. Id. at 27. On this issue, we observed that when the administrative orders were imposed, the BSEA had not yet begun to analyze the plaintiffs' substantive claim -- whether they were entitled to relief pursuant to the IDEA -- because it had yet to convene a due process hearing. Id. at 26-27. The BSEA's decisions, therefore, were not substantive ones made

---

[5] We noted in Smith that this circuit had not "squarely addressed whether judgments on the merits or consent decrees are the only forms of relief sufficient to confer prevailing party status, whether a functional equivalent of such relief may be adequate, or whether any other types of relief could satisfy Buckhannon's requirements." Smith, 401 F.3d at 23; see also Doe, 358 F.3d at 24 n.4.

after reviewing the merits of plaintiffs' claims, but rather orders directing Fitchburg to do what it had already promised the plaintiffs it would do. Id. at 27. Accordingly, the "orders and ruling were [not] issued . . . to place the weight of judicial authority behind Fitchburg's substantive concession that [plaintiff] was entitled to an IEP," and hence the relief obtained by the plaintiffs lacked the necessary judicial imprimatur. Id.

4. Applying Buckhannon and Smith

Citing Smith, the government contends that the district court's remand order did not provide the necessary "judicial imprimatur" for Aronov's sought-after remedy, naturalization. The government maintains that it already had voluntarily decided to grant Aronov's application. It then established a specific time-frame for doing so, and the court order merely "memorialized" the government's independent concessions, as it did in Smith. Further, the remand order did not include any "appropriate instructions" directing the government to take specific action, see 8 U.S.C. § 1447(b), or retain jurisdiction in order to determine whether the government followed through on its voluntary decision to approve Aronov's application. Accordingly, the order had no substantive effect on the proceeding and, therefore, did not constitute a "judicial imprimatur," as the Supreme Court defined it in Buckhannon and as we applied the standard in Smith.

-13-

We reject the government's arguments and find its reliance on Smith misplaced. Most of the language from Smith relied upon by the government comes in that portion of the panel's decision where it assesses whether the plaintiff's relief, "even though not in the form of a consent decree or a final judgment on the merits, comports with the overarching requirements of Buckhannon; that is, whether the [administrative hearing officer's involvement] provided the necessary judicial imprimatur on a material alteration of the legal relationship between the parties." Smith, 401 F.3d at 26. As the panel noted, "[the plaintiff] does not argue that the order dismissing her case is the functional equivalent of a consent decree, and thus we deem that argument waived." Id. at 24. Moreover, the Smith panel assessed whether the order of an administrative hearing officer, rather than the order of a judge, meets the prevailing party standard set forth in Buckhannon. Since the administrative law analog to a judicial consent decree is uncertain, the focus of the panel in Smith was whether the administrative orders were akin to a judgment on the merits. In short, the Smith decision has little relevance to the prevailing party issue here, which turns on whether the district court's order was the functional equivalent of a consent decree.

Nevertheless, though offered as dicta, the Smith panel made some useful observations about the concept of the functional equivalent of a consent decree. Specifically, the panel

-14-

distinguished between a court's incorporation of the terms of an agreement between the parties, which made the court order functionally equivalent to a consent decree, and mere recognition of an agreement accompanied by the dismissal of the case because there is no longer a dispute, which was not equivalent to a consent decree. Relying on the Fourth Circuit's decision in Smyth v. Rivero, the panel put that critical difference in these terms:

> Thus, "either incorporation of the terms of the agreement or a separate provision retaining jurisdiction over the agreement will suffice for [an order to be considered the functional equivalent of a consent decree]" . . . In contrast, "[w]here a court merely recognizes the fact of the parties' agreement and dismisses the case because there is no longer a dispute before it, the terms of the agreement are not made part of the order and consequently will not serve as a basis of jurisdiction."

Smith, 401 F.3d at 24 (quoting Smyth, 282 F.3d 268, 283 (4th Cir. 2002)).

Here, the district court held that its remand order fell under the first category of orders -- where the court incorporates the terms of the parties' agreement into an order -- rather than the second -- where the court merely recognizes the agreement and dismisses the matter as no longer in dispute. As the district court put it:

> In Buckhannon, the government acted independently to give the plaintiff what it wanted, and then sought dismissal. Here, the Court remanded specifically "so that USCIS can grant plaintiff's application for

-15-

> naturalization, and schedule plaintiff's oath ceremony for no later than November 8, 2006." This is the judicial imprimatur required by and lacking in the specific facts of <u>Buckhannon</u>. Where the government in <u>Buckhannon</u> took its conciliatory action purely voluntarily, and took on no further duties in the dismissal, the government here was granted not a dismissal, but a remand to the agency <u>conditional on</u> the granting of plaintiff's naturalization by November 8, 2006. Had the naturalization not so occurred, the parties might very well be back in front of this Court litigating a contempt action. This is far more than a catalyst theory -- it was an order of the Court.

<u>Aronov</u> v. <u>Chertoff</u>, No. 06-11526-NG, 2007 U.S. Dist. LEXIS 40455, at *4-5 (Jan. 30, 2007) (emphasis in original).

Because the district court is in the best position to explain the meaning of its own order, we defer to its conclusion on the significance of the remand order. See <u>Kinton</u>, 284 F.3d at 30 ("Clearly, the district court is in the best position to determine whether its statements . . . should be considered as the functional equivalent of a judicial order within the meaning of <u>Buckhannon</u>."); <u>Harvey</u> v. <u>Johanns</u>, 494 F.3d 237, 242 (1st Cir. 2007) ("We must, of course, accord deference to the district court's interpretation of the wording of its own order."); <u>see</u> <u>also</u> <u>Lefkowitz</u> v. <u>Fair</u>, 816 F.2d 17, 22 (1st Cir. 1987) ("[U]ncertainty as to the meaning and intendment of a district court order can sometimes best be dispelled by deference to the views of the writing judge.").

Moreover, based on our assessment of the remand order and the circumstances of its issuance, we see no reason to question the

-16-

district court's assessment of its own work. After Aronov filed suit in the district court under the statute, USCIS lost jurisdiction to adjudicate Aronov's application, thereby precluding it from entering a binding legal agreement with Aronov regarding his application. 8 U.S.C. § 1447(b) ("Such court has jurisdiction over the matter and may either determine the matter or remand the matter, with appropriate instructions, to the [USCIS] to determine the matter."); see Etape v. Chertoff, 497 F.3d 379, 384-85 (4th Cir. 2007).[6] The parties acknowledged as much in their joint motion for remand to the district court, which highlights the terms of 8 U.S.C. § 1447(b). Therefore, despite the agency's concession to allow Aronov's naturalization, it did not have the authority to effectuate that outcome until the district court returned jurisdiction to the agency. The court's order was indispensable to the naturalization outcome.

The court's remand order also ended the dispute by providing Aronov his sought-after relief. To be sure, the district

_____

[6] The question of whether the court maintains exclusive jurisdiction or, alternatively, concurrent jurisdiction with the USCIS has been litigated in other courts. Most courts have held that the district court has exclusive jurisdiction over the application until it has acted pursuant to the statute. See, e.g., Etape, 497 F.3d at 384-85 (holding that § 1447(b) vests the district court with exclusive jurisdiction over a naturalization application); United States v. Hovsepian, 359 F.3d 1144, 1159 (9th Cir. 2002) (en banc) (same). But see, e.g., Bustamante v. Chertoff, 533 F. Supp. 2d 373, 381 (S.D.N.Y. 2008) (reaching the opposite conclusion). Here, the government does not assert that the USCIS maintained jurisdiction over Aronov's application after he filed suit in district court.

court relied on the government's statements in the joint motion for remand that naturalization was appropriate. However, because of the jurisdictional element, the district court could reasonably conclude that it was ultimately the remand order, not the agency's concession, that brought about the material change in the parties' relationship and "place[d] the weight of judicial authority" on the agreed-upon alteration in Aronov's legal status, see Smith, 401 F.3d at 26.

There remains the question of the form of the court's order. If the district court had entered an order explicitly setting forth the agreement of the parties as set forth in the joint motion for remand, its order would unquestionably be a consent decree. See Frew v. Hawkins, 540 U.S 431, 437 (2004) ("A consent decree 'embodies an agreement of the parties' and is also 'an agreement that the parties desire and expect will be reflected in, and be enforceable as, a judicial decree that is subject to the rules generally applicable to other judgments and decrees.'" (quoting Rufo v. Inmates of Suffolk County Jail, 502 U.S. 367, 378 (1992))); see also Black's Law Dictionary (8th ed. 2004) (defining a "consent decree" as "[a] court decree that all parties agree to"). Yet the district court's brief remand order here, which incorporated the terms of the joint motion by reference, had the same import and effect. See Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 381 (1994) (indicating that a court would

-18-

maintain jurisdiction to enforce a settlement agreement "if the parties' obligation to comply with [its] terms . . . had been made part of the order of dismissal -- either by separate provision . . . or by incorporating the terms of the settlement agreement in the order. In that event, a breach of the agreement would be a violation of the order, and ancillary jurisdiction to enforce the agreement would therefore exist."). Hence the brief remand order was the functional equivalent of a consent decree. If the government had failed to comply with the terms of the remand order, Aronov could have sought enforcement of the order through a contempt proceeding, as the district court noted. He would not have had to file a separate contract action against the agency or another suit under § 1447(b).[7]

_____

[7] This distinction has an analog in the private realm, where one party is seeking to enforce the terms of a settlement agreement against another private party. If the terms of the settlement agreement have not been incorporated into a court order, the federal courts will often lack jurisdiction to enforce its terms. In contrast, where the parties have obtained a consent decree or a court order that either incorporates the terms of the settlement agreement or explicitly retains jurisdiction, a federal court will possess "enforcement" or "ancillary" jurisdiction to enforce the terms of the order. See Kokkonen, 511 U.S. at 381; Buckhannon, 532 U.S. at 604 n.7 ("[F]ederal jurisdiction to enforce a private contractual settlement will often be lacking unless the terms of the agreement are incorporated into the order of dismissal.") (emphasis added); see also Fafel v. DiPaola, 399 F.3d 403, 414 (recognizing that a federal court had ancillary jurisdiction to enforce its prior Fed. R. Civ. Pro. 68 judgment because the judgment, although limited in nature, "necessarily incorporate[d] the terms of the underlying Rule 68 offer" and the district court limited its exercise of ancillary jurisdiction to enforcing the terms of that prior judgment); Martel v. Fridovich, 14 F.3d 1, 3 n.4 (1st Cir. 1993) (per curiam) ("The appropriate vehicle for

-19-

There is ample authority for the proposition that the functional equivalent of a consent decree satisfies the requirements of <u>Buckhannon</u>.[8] Like our sister circuits, we do not read <u>Buckhannon</u> so narrowly as to preclude all forms of judicial

_____

enforcement of the consent decree is an action for contempt brought before the court responsible for the decree.").

[8] <u>See</u>, <u>e.g.</u>, <u>Truesdell</u> v. <u>Phila. Hous. Auth.</u>, 290 F.3d 159, 165 (3d Cir. 2002) (holding that a court order, characterized by the defendant as a stipulated settlement, was sufficient to support a finding of judicial imprimatur where the order contained mandatory language, included the judge's signature, and was judicially enforceable); <u>Smyth</u>, 282 F.3d at 281 ("We doubt that the Supreme Court's guidance in <u>Buckhannon</u> was intended to be interpreted so restrictively as to require that the words 'consent decree' be used explicitly."); <u>T.D.</u> v. <u>LaGrange Sch. Dist. No. 102</u>, 349 F.3d 469, 478 (7th Cir. 2003) ("[S]ome settlement agreements, even though not explicitly labeled as a 'consent decree' may confer 'prevailing party' status, if they are sufficiently analogous to a consent decree."); <u>Carbonell</u> v. <u>INS</u>, 429 F.3d 894, 901 (9th Cir. 2005) ("[W]hen a court incorporates the terms of a voluntary agreement into an order, that order is stamped with sufficient 'judicial imprimatur' for the litigant to qualify as a prevailing party for the purpose of awarding attorney's fees."); <u>Am. Disability Ass'n, Inc.</u> v. <u>Chmielarz</u>, 289 F.3d 1315, 1320 (11th Cir. 2002) ("A formal consent decree is unnecessary . . . because the explicit retention of jurisdiction or the court's order specifically approving the terms of the settlement are . . . the functional equivalent of the entry of a consent decree."); <u>Davy</u> v. <u>CIA</u>, 456 F.3d 162, 166 (D.C. Cir. 2006) ("Where a settlement agreement is embodied in a court order such that the obligation to comply with its terms is court-ordered, the court's approval and the attendant judicial over-sight (in the form of continuing jurisdiction to enforce the agreement) may be equally apparent. We will assume, then, that an order containing an agreement reached by the parties may be functionally a consent decree for purposes of the inquiry to which <u>Buckhannon</u> directs us."); <u>see</u> <u>also</u> <u>Bell</u> v. <u>Bd. of County Comm'rs. of Jefferson County</u>, 451 F.3d 1097, 1103 (10th Cir. 2006) ("Most circuits recognize that some settlement agreements, even though not explicitly labeled as a consent decree may confer prevailing party status, if they are sufficiently analogous to a consent decree.") (internal quotations omitted).

relief other than a judgment on the merits or a court order in the form of a consent decree, or one explicitly labeled as such, from satisfying the judicial imprimatur requirement.[9] Therefore, the district court did not abuse its discretion in holding that its remand order issued pursuant to § 1447(b) incorporated the terms of the parties' joint motion and hence was the functional equivalent of a court-ordered consent decree.[10] Accordingly, the order constituted the necessary "judicial imprimatur" on the parties'

---

[9] Although in Smith we noted that there was disagreement among our sister circuits on this question, citing the Eighth Circuit's decision in Christina A. v. Bloomberg, 315 F.3d 990 (8th Cir. 2003), as an example of a court reading Buckhannon narrowly to preclude all other forms of relief, the Eighth Circuit has more recently repudiated our reading of its decision. See Smith, 401 F.3d at 23. In Northern Cheyenne Tribe v. Jackson, 433 F.3d 1083, 1085 n.2 (8th Cir. 2006), the court asserted that its decision in Christina A. did not foreclose the possibility that other types of court-ordered relief could provide the requisite judicial imprimatur required by Buckhannon.

[10] The dissent asserts that the issue of whether the district court's remand order was the equivalent of a consent decree was not raised by either party, nor was it the theory on which the district court relied, and therefore we should not analyze that issue in deciding the case. The district court did not use the phrase "functional equivalent of a consent decree" in its decision awarding attorney's fees and costs to Aronov. Nevertheless, in addressing the judicial imprimatur question in its decision, the district court described its order as incorporating the terms of the parties' joint motion for remand. It further stated that its order could be enforced through a contempt action. Hence the district court described its order in consent-decree terms. The government chose not to challenge this consent-decree aspect of the district court's decision. Instead, it advanced a largely irrelevant judicial imprimatur argument under our Smith decision that it deemed more favorable to its position. Aronov responded to the argument made by the government. He had no obligation to respond to an argument that the government did not make.

-21-

change in legal relationship, qualifying Aronov as a prevailing party.

## B. Substantial Justification

### 1. Framework for Review

The government bears the burden of demonstrating that its position was substantially justified. Shock, 254 F.3d at 5. The Supreme Court has interpreted the "substantially justified" language in the EAJA to require reasonableness: "[A]s between the two commonly used connotations of the word 'substantially,' the one most naturally conveyed by the phrase before us here is not 'justified to a high degree,' but rather 'justified in substance or in the main' -- that is, justified to a degree that could satisfy a reasonable person." Pierce, 487 U.S. at 565; see also, e.g., Shock, 254 F.3d at 5; Dantran, Inc. v. U.S. Dep't of Labor, 246 F.3d 36, 40-41 (1st Cir. 2001). Thus, the key question is whether the government's position has "a reasonable basis in law and fact." Pierce, 487 U.S. at 566 n.2.

As a matter of law, the government's position is substantially justified when the government's actions are required by a statute or law. See Dantran, 246 F.3d at 41; United States v. One Parcel of Real Prop., 960 F.2d 200, 208-09 (1st Cir. 1992); see also United States v. B & M Used Cars, 860 F.2d 121, 124 (4th Cir. 1988) ("Whether the government's decision . . . was reasonable must be examined in light of . . . the appropriate statute.").

-22-

Additionally, the government's position may be substantially justified even if its reasonable interpretation of its legal obligations is not ultimately affirmed by a court.  Schock, 254 F.3d at 5.  The district court having concluded that the government's litigation position was substantially justified, we review only the government's pre-litigation position.  28 U.S.C. § 2412(d)(2)(D); Shock, 254 F.3d at 5.

2. The District Court's Decision

In focusing on the government's pre-litigation position, the court noted that more than a year and a half had passed between Aronov's citizenship exam and the filing of his action -- an amount of time that exceeded by a multiple of four the statutory period that was a prerequisite for filing an action under 8 U.S.C. § 1447(b).  The court viewed this delay as unjustified because the government had procedures in place for expediting an FBI name check application, including issuance of a writ of mandamus.  The court concluded that "[i]t is not 'substantially justified' for the government to force naturalization applicants to incur additional expense -- and the courts to be burdened -- just to have naturalization applications processed in the timely manner already supposedly guaranteed by statute."  It rejected the government's argument that it was unable to act on Aronov's application sooner because the FBI did not complete its background check until September 2006.

-23-

        3. The Government's Position

        The government claims that two statutes justify its actions and inactions on Aronov's application.  First, it cites 8 U.S.C. § 1446(a), which provides that "[b]efore a person may be naturalized, an employee of the [USCIS], or of the United States designated by the Attorney General, shall conduct a personal investigation of the person applying for naturalization."  It asserts that because the personal investigation of Aronov required by the statute had not been completed before he filed suit, USCIS could not legally grant him citizenship.  Second, the government cites language included by Congress in the 1998 Appropriations Act, which has continuing effect: "During fiscal year 1998 and each fiscal year thereafter, none of the funds appropriated or otherwise made available to [USCIS] shall be used to complete adjudication of an application for naturalization unless [USCIS] has received confirmation from the Federal Bureau of Investigation that a full criminal background check has been completed . . . ."  Depts. of Commerce, Justice & State, The Judiciary & Related Agencies Appropriations Act of 1998, Pub. L. 105-119, Stat. 2440-2448-49 (1997) (8 U.S.C. § 1446 note) (emphasis added).  It asserts that this language prevented USCIS from taking final action on Aronov's application before the FBI finished its background check in September 2006, after Aronov had filed suit.

In response, Aronov argues that neither the language of 8 U.S.C. § 1446(a) nor the 1998 Appropriations Act requires the USCIS to undertake the comprehensive FBI name check, which the government concedes has been the primary cause of the delay in Aronov's proceeding. Further, he notes that the agency policy calling for such name checks has not been codified in any regulation. Finally, he cites a report from the USCIS's ombudsman that raised questions about the wisdom of the USCIS policy to require such searches, particularly in light of the significant backlog of applicants waiting for their FBI name checks to be completed.

Before addressing the parties' arguments, we briefly discuss the FBI name check process and the USCIS's use of that process for adjudicating naturalization applications.

a. The FBI's National Name Check Program

The FBI's National Name Check Program ("NNCP") was established during the Eisenhower Administration by Executive Order 10450. The NNCP reviews information in the FBI's files to determine whether an individual has been the subject of, or mentioned in, any FBI investigations. NNCP provides this information to dozens of federal, state, and foreign agencies "seeking background information from FBI files on individuals before bestowing a privilege -- [w]hether that privilege is government employment or an appointment; a Green card or

naturalization; admission to the bar; or a visa for the privilege of visiting our homeland." Foreign Travel to the United States: Testimony Before the H. Comm. on Gov. Reform (July 10, 2003) (statement of Robert J. Garrity, Jr., Assistant Dir., Records Mgmt. Div., Fed. Bureau of Investigation), available at 2003 WL 21608243 (hereinafter Garrity). The NNCP also "conducts numerous name searches in direct support of the counterintelligence, counterterrorism, and homeland security efforts of the FBI." Id.

The USCIS commissions the FBI on a fee-for-service basis to provide the name checks, in accordance with USCIS-defined standards. USCIS Ombudsman, Annual Report to Congress June 2007, at 38, available at http://www.dhs.gov/xlibrary/assets/CISOMB_Annual%20Report_2007.pdf. The scope of these standards has expanded over time. Until late 2002, the FBI was required to search only its "main" files for possible links between the applicant and an individual who was previously the target of an FBI investigation. In late 2002, however, in response to heightened security concerns after the attacks on September 11, 2001, and an incident in which an individual who was a member of a terrorist group was awarded benefits, the USCIS revised its policy and began requiring more comprehensive FBI name checks. These checks entailed a search of the FBI's "reference" files in addition to its main investigation files. United States Dep't of Homeland Security, Office of Inspector General, A Review of the U.S. Citizenship and Immigration

-26-

Services' Alien Security Checks 24 n.30 (Nov. 2005), available at www.dhs.gov/xoig/assets/mgmtrpts/OIG_06-06_Nov05.pdf; see also Spencer S. Hsu and N.C. Aizenman, FBI Name Check Cited in Naturalization Delays, Wash. Post, June 17, 2007, at A1. Additionally, USCIS resubmitted 2.4 million applicant names to the FBI for these expanded checks. As currently undertaken, the FBI name check process entails the following:

> The name is electronically checked against the FBI Universal Indices (UNI). The searches seek all instances of the individual's name and close date of birth, whether a main file name or reference. . . . The names are searched in a multitude of combinations, switching the order of first, last, middle names, as well as combinations with just the first and last, first and middle, and so on. It also searches different phonetic spelling variations of the names . . . .
> If there is a match with a name in a FBI record, it is designated as a 'Hit,' meaning that the system has stopped on a possible match with the name being checked, but now a human being must review the file or indices entry to further refine the names 'Hit" on. . . .
> Approximately 85% of name checks are electronically returned as having "No Record" within 72 hours. . . . A secondary manual name search usually identifies an additional 10% of the requests as having a "No Record" . . . . The remaining 5% are identified as possibly being the subject of an FBI record. The FBI record must now be retrieved and reviewed. If the records were electronically uploaded into the FBI Automated Case Support (ACS) electronic recordkeeping system, it can be viewed quickly. If not, the relevant information must be retrieved from the existing paper record.

Garrity, supra.

-27-

Before September 11, 2001, the FBI received approximately 2.5 million name check requests per year. After the USCIS revised its policy in 2002, that number increased. Id. For example, in the FBI's fiscal year 2003 alone, it received over 6 million name check requests. Federal Bureau of Investigation, National Name Check Program, http://www.fbi.gov/hq/nationalnamecheck.htm (last visited June 27, 2008). USCIS currently processes approximately 1.5 million applications requiring name checks annually, including applications both for green cards and for citizenship, and 99% of these are cleared by the FBI in less than six months. Julia Preston, Rules Eased to Expedite Green Card Applications, N.Y. Times, Feb. 12, 2008, at A12. Other applications, however, take longer; approximately 140,000 USCIS applications have been held up in the FBI's name check system for six months or longer. Spencer S. Hsu, U.S. To Skirt Green-Card Check, Wash. Post, Feb. 12, 2008, at A3. As of May 2007, of the about 329,000 cases pending before USCIS, "64% were stalled [with the agency] for more than 90 days, 32% for more than one year and 17% for more than two years." Hsu and Aizenman, supra, at A1.[11]

---

[11] To help alleviate this backlog, USCIS decided in February 2008 to give preliminary approval to green card applicants for whom an FBI fingerprint check and Interagency Border Inspection Services check have been successfully completed and an FBI name check request has been pending for over six months. If the eventual name check turns up negative information, the visa will be canceled and deportation proceedings commenced. Memorandum from Michael Aytes, Assoc. Dir., USCIS Domestic Operations, to USCIS Field Leadership 2 (Feb. 4, 2008), available at

The FBI name check is one piece of the larger background check that the USCIS commissions for all naturalization applicants. In addition to the FBI name check, the agency conducts a name check in the Interagency Border Inspection System (IBIS), "a multiagency effort with a central system that combines information from multiple agencies, databases and system interfaces to compile data relating to national security risks, public safety issues and other law enforcement concerns." Fact Sheet, USCIS Press Office, Immigration Security Checks -- How and Why the Process Works 2 (April 25, 2006), available at http://www.uscis.gov/files/pressrelease/security_checks_42506.pdf. Results of an IBIS check are typically available immediately. Id. The FBI also obtains an applicant's fingerprints in order to search the existing criminal databases for records of arrests and criminal convictions. The FBI typically forwards a response on the fingerprint check to USCIS within 24 to 48 hours. Id.

### b. Statutory Requirements

There is nothing in the language of 8 U.S.C. 1446(a) or the 1998 Appropriations Act that requires USCIS to include the NNCP in the naturalization process. Neither provision cited by the government states explicitly that an FBI name check is required, let alone a name check that includes an evaluation of all FBI

---

http://www.uscis.gov/files/pressrelease/DOC017.pdf. This change does not apply to citizenship applicants because "revoking naturalization is a much more difficult thing to do" than revoking a green card. Hsu, supra, at A3 (quoting USCIS Spokesman Christopher S. Bentley).

reference files in addition to the main files.  Section 1446(a) requires only that a "personal investigation" be conducted prior to allowing an individual to be naturalized, while the 1998 appropriations bill limits funds to the USCIS to complete adjudication of a naturalization application until the agency has received FBI confirmation that a "full criminal background check" has been completed.  There is no specification in the bill beyond this phrase.  It is entirely plausible -- indeed likely -- that the language used by Congress in the 1998 appropriations bill referred to the FBI's criminal history check, which is an established, preliminary step taken in the naturalization process, rather than the FBI name check.

Importantly, the FBI name check program had already been in place for decades at the time the statutes relied upon by the government were enacted.  If Congress intended to mandate that the USCIS commission FBI name checks before granting naturalization applications, it could have explicitly referenced such checks. See, e.g., United States v. Cabrera, 208 F.3d 309, 314 (1st Cir. 2000) (examining Congress's other textual options in interpreting the statutory language at issue).  Other than an unpersuasive reliance on the text of the statutes, the government has not

identified any evidence that Congress intended to require the FBI name checks.[12]

Indeed, USCIS did not even begin requiring the full, comprehensive FBI name checks until 2002, years after passage of the applicable statutes. That fact confirms that the comprehensive name checks were a result of a policy change within the agency

―――――――――――

[12] Although the government has not invoked it, a regulation relevant to interpreting the scope of the statutory provisions at issue does exist. In full, 8 C.F.R. § 335.2(b) reads:

> Completion of criminal background checks before examination. The Service will notify applicants for naturalization to appear before a Service officer for initial examination on the naturalization application only after the Service has received a definitive response from the Federal Bureau of Investigation that a full criminal background check of an applicant has been completed. A definitive response that a full criminal background check on an applicant has been completed includes:
>
> (1) Confirmation from the Federal Bureau of Investigation that an applicant does not have an administrative or a criminal record;
>
> (2) Confirmation from the Federal Bureau of Investigation that an applicant has an administrative or a criminal record; or
>
> (3) Confirmation from the Federal Bureau of Investigation that two properly prepared fingerprint cards (Form FD-258) have been determined unclassifiable for the purpose of conducting a criminal background check and have been rejected.

The regulation does not assist the agency's claims because, like the statutes, it gives no indication that a "full" criminal background check includes an FBI name check.

-31-

after the September 11, 2001 attacks rather than a congressional mandate.[13]

In sum, the statutes cited by the government did not require USCIS to commission FBI name checks -- let alone comprehensive ones -- before adjudicating a naturalization application. Therefore, the "mandated by statute" rationale fails as a substantial justification for the agency's delays in adjudicating Aronov's application.

### c. The Application of Chevron

Perhaps realizing the flaws in its statutory argument, the government offers an alternative basis for finding that its pre-litigation position on Aronov's naturalization application was substantially justified. Relying on Chevron U.S.A. Inc. v. Natural Resource Defense Council, Inc., 467 U.S. 837, 842-45 (1984), the government asserts that we must defer to the USCIS's decisions regarding the scope of the "personal investigation" and "full criminal background check" of an applicant for naturalization because Congress, pursuant to the statutes discussed above, has

---

[13] The USCIS's recent change of policy to grant thousands of green-card applicants permanent residency before their full FBI name checks are completed reinforces this view. Although the agency did not take the same step with respect to naturalization applications, it attributed the differential treatment to the difficulty of revising naturalization decisions, not to statutory requirements. Hsu, supra, at A3 (citing USCIS Spokesman Christopher S. Bentley). In so explaining the discrepancy, the agency implicitly acknowledged that it was not prohibited by law from extending the policy to naturalization decisions.

committed to the agency the decision-making authority on these issues. The government argues that the agency, having concluded that the comprehensive FBI name checks are "essential" to the background investigations, was substantially justified in awaiting completion of Aronov's background check before adjudicating his naturalization application. Acknowledging that a small percentage of name checks take a considerable amount of time to complete, the agency asserts implicitly that those isolated delays, which are the fault of the FBI and not USCIS, should not prevent the government from maintaining the name check requirement as its policy and applying to it Aronov's naturalization application. That is, the agency argues that its general policy of requiring the name checks excuses the delays associated with individual naturalization applications, such as Aronov's.

Even if the government is entitled to invoke <u>Chevron</u> to defend its general policy on the FBI name check process, <u>see</u>, <u>e.g.</u>, Cass Sunstein, <u>Chevron Step Zero</u>, 92 Va. L. Rev. 187 (2006) (analyzing the standards for determining whether an agency interpretation is entitled to evaluation under the <u>Chevron</u> framework), deference to its general policies does not require us to find substantial justification in this particular instance.[14]

---

[14] Aronov argues on a number of grounds that the USCIS's name check policy is not entitled to <u>Chevron</u> deference. We need not reach that question because of our conclusion that even if the agency is entitled to <u>Chevron</u> deference for its policy requiring FBI name checks, this deference does not substantially justify the

The government's eighteen-month delay in acting on Aronov's naturalization application directly contravened § 1447(b), which gives a district court jurisdiction to evaluate a naturalization application if the agency has failed to adjudicate the application within 120 days after conducting its initial examination. See Etape, 497 F.3d at 385; see also Hovsepian, 359 F.3d at 1163 ("A central purpose of [§ 1447(b)] was to reduce the waiting time for naturalization applicants." (citing H.R. Rep. No. 101-187, at 8 (1989); 135 Cong. Rec. H4539-02, H4542 (1989) (statement of Rep. Morrison))) Both the courts and the agency itself have interpreted § 1447(b) as imposing a 120-day deadline for agency action. See Hovsepian, 359 F.3d at 1161; 8 C.F.R. § 335.3(a) ("A decision to grant or deny the application shall be made at the time of the initial examination or within 120-days after the date of the initial examination of the applicant for naturalization . . . .") (emphasis added); see also Walji v. Gonzales, 500 F.3d 432, 439 (5th Cir. 2007) ("[B]ecause the clear intent of Congress was to accelerate naturalization applications, and the statutory and regulatory language gives a definite time frame for decision once an examination has occurred, [§ 1447] is violated in situations [where the 120-day period is not complied with].").

---

government's pre-litigation conduct in this particular instance.

In addition to § 1447(b)'s specific command,[15] the Administrative Procedures Act ("APA"), 5 U.S.C. § 555(b), offers a more general directive to agencies to resolve matters presented to it within a reasonable amount of time. See 5 U.S.C. § 555(b) ("With due regard for the convenience and necessity of the parties or their representatives and within a reasonable time, each agency shall proceed to conclude a matter presented to it."). Our assessment of what is reasonable is informed by the relevant statutes and regulations. See Towns of Wellesley, Concord and Norwood, Mass. v. FERC, 829 F.2d 275, 277 (1st Cir. 1987) (discussing the guidelines, including the existence of a "rule of reason," which govern the time an agency may take to make a decision) (citing Telecomms. Research & Action Ctr. v. FCC, 750 F.2d 70 (D.C. Cir. 1984))); Caswell v. Califano, 583 F.2d 9, 16 (1st Cir. 1978) (indicating that courts may look to statutory text to provide a reasonable time limit on agency action). Here, §

_____

[15] The dissent's treatment of the 120-day time frame established by 8 U.S.C. § 1447(b) is curious. Although the dissent acknowledges that the agency has adopted a regulation, 8 C.F.R. § 335.3(a), that treats the 120-day time frame as a deadline, the dissent treats the statutory and regulatory time frame as merely aspirational in nature, with no consequence for the agency if it fails to comply. If Congress had taken such a relaxed view of its 120-day time frame, it would not have explicitly provided that an applicant whose naturalization application remains unresolved at the end of the 120-day period may file suit in federal court to have the application either adjudicated by the court or remanded to the agency with instructions to adjudicate it. See, e.g., Etape, 497 F.3d at 384-85 (concluding that after an applicant has filed suit with the district court pursuant to § 1447(b), the court has exclusive jurisdiction over the application).

1447(b) and 8 C.F.R. § 335.3(a)[16] provide such guidance. See Sze v. INS, No. C-97-0569 SC, 1997 WL 446236, at *7 (N.D. Cal. July 24, 1997) ("[T]he 120-day rule provides the court with a measure of what constitutes a reasonable period for INS to process naturalization applications.").

Without foreclosing the possibility that the government could provide substantial justification grounded in the facts of a particular case for not complying with the 120-day statutory requirement, the government has advanced no such particularized justification here. Instead, the agency has offered only general justifications for the delay, including the agency's policy of requiring name checks for security purposes and the significant backlog of names that the FBI is processing. These explanations, however, do not justify the agency's disregard of the clear statutory mandate. As a district court deciding this exact issue has aptly stated:

> But while a reasonable person would not dispute the necessity of conducting a background check on an applicant for naturalization, a reasonable person would require a satisfactory justification for a substantial delay in completing the background check. Indeed, government agencies are required to conclude matters presented to them within a "reasonable time." See 5 U.S.C. §

_____

[16] 8 C.F.R. § 335.3(a) states: "A decision to grant or deny the [naturalization] application shall be made at the time of the initial examination or within 120-days after the date of the initial examination of the applicant for naturalization under § 335.2."

-36-

555(b). Otherwise, an applicant for naturalization remains in perpetual limbo and is by de facto, denied his citizenship, a right that has been afforded by Congress to deserving individuals since the rise of the American democracy. This is particularly true when Congress has enacted legislation permitting the applicant to apply to federal district court if a decision is not rendered on the application within 120 days of the completion of the examination under 8 U.S.C. § 1447(b). Here, Defendants offer no justification for the delay; rather, they merely state that "background checks were necessary and had to be completed before the plaintiff could be naturalized." This explanation merely restates, in a conclusory manner, the necessity of completing the background check; it does not justify the delay.

Alghamdi v. Ridge, No. 3:05cv344-RS, 2006 WL 5670940, at *14 (N.D. Fla. Sept. 25, 2006). Although we also acknowledge that the agency has valid -- indeed persuasive -- reasons for requiring comprehensive FBI name checks under ordinary circumstances, that policy determination cannot justify the failure to comply with a statutory deadline. See, e.g., Rotinsulu v. Mukasey, 515 F.3d 68, 72 (1st Cir. 2008) ("An agency has an obligation to abide by its own regulations.").

Indeed, despite the agency's assertions that the FBI backlog was a significant cause of the delays in this case, the ultimate cause of the agency's failure to comply with the law was its own non-compliance with its regulations.[17] If the agency had

---

[17] Specifically, the agency failed to comply with 8 C.F.R. § 335.2(b). The regulation states: "The Service will notify

-37-

properly deferred conducting its initial interview of Aronov until the FBI name check process had been completed, the statutory obligation would not have arisen.[18]  In its brief, the government has neither explained nor justified its non-compliance with 8 C.F.R. § 335.2(b) in connection with Aronov's application or that of any other naturalization applicant.[19]

Therefore, the government's assertion that it was required to wait until Aronov's FBI name check was completed before finally adjudicating his naturalization application does not have "a reasonable basis in law and fact."  Pierce, 487 U.S. at 566 n.2.

---

applicants for naturalization to appear before a Service officer for initial examination on the naturalization application only after the Service has received a definitive response from the Federal Bureau of Investigation that a full criminal background check of an applicant has been completed."  Id.

[18] We acknowledge the oddity that arises because of the agency's regulations.  If USCIS had complied with its regulations and waited to interview Aronov until the FBI name check had been completed, his waiting time for the completion of the naturalization process might have been longer than it was here.  However, this fact does not alter our legal analysis.  Once USICS gave Aronov his initial interview, it had to confront the clear timing obligation imposed by Congress.

[19] Based on a recent press release issued by USCIS on April 2, 2008, there appear to be approximately 29,800 applicants whose naturalization applications were submitted to the FBI before May 2006 and whose interviews have already been completed.  The agency has requested that the FBI prioritize their name checks.  This is one piece of a larger, joint plan between the agency and the FBI to eliminate the backlog of name checks.  The FBI also announced its intention to have processed all name checks pending for more than three years by May of this year.  See News Release, USCIS, USCIS and FBI Release Joint Plan to Eliminate Backlog of FBI Name Checks (Apr. 2, 2008), available at http://www.uscis.gov/files/article/NameCheck_2Apr08.pdf.

Indeed, the government's attempt to invoke an administrative policy to trump an explicit statutory command turns Chevron deference on its head. See Stinson v. United States, 508 U.S. 36, 44 (1993) ("Under Chevron, if a statute is unambiguous the statute governs."). In light of the 120-day statutory directive, the agency's long delay (over four times the statutory period), and the absence of any evidence that the government tried to expedite Aronov's application to comply with the statute, the government's conduct toward Aronov can only be classified as unreasonable and not substantially justified. See Russell v. Nat'l Mediation Bd., 775 F.2d 1284, 1290 (5th Cir. 1985) (concluding that the government's position was not substantially justified because it breached a clear statutory mandate). Accordingly, we conclude that the district court did not abuse its discretion in holding that the government's pre-litigation conduct was not substantially justified.[20]

## III.

For the foregoing reasons, we affirm the district court's order granting Aronov's application for attorney's fees and expenses under 28 U.S.C. § 2412(d)(1)(A). Additionally, we remand the matter to the district court so that the fee award may be

---

[20] We also conclude that the district court did not abuse its discretion in finding that there are no "special circumstances [that] make an award [of attorney's fees] unjust." See Schock, 254 F.3d at 4 (quoting 28 U.S.C. § 2412(d)(1)(A)).

recalculated to reflect the fees and expenses associated with this appeal.

So ordered.

**-- Dissenting Opinion Follows –**

**LYNCH**, **Chief Judge**, **dissenting**.  With respect, I dissent. Because the award rests on errors of law, I would reverse.

The Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412(d)(1)(a), must be construed in favor of the United States. Ardestani v. INS, 502 U.S. 129, 137 (1991).  The Act requires a court to award fees and expenses to a prevailing party in a civil action against the United States unless the court finds that the position of the United States was substantially justified, or that special circumstances make an award unjust.  28 U.S.C. § 2412(d)(1)(a).  The purpose of the Act was to "ensure that certain individuals . . . will not be deterred from seeking review of, or defending against, unjustified governmental action because of the expense involved . . . .  The Act reduces the disparity in resources between individuals . . . and the federal government." H.R. Rep. 99-120(I), at 4 (1985); see also Scarborough v. Principi, 541 U.S. 401, 407 (2004).[21]

I disagree with the majority's reasoning on both prongs of the EAJA analysis.  This result contravenes the purposes of the

---

[21]    See also 131 Cong. Rec. S9991-02, 1985 WL 715613 (daily ed. July 24, 1985) (statement of Sen. Grassley) (noting that the purpose of the Act was to prevent "meritless" government action); id. (statement of Sen. DeConcini) ("Before the [EAJA], small businesses, faced with unjustified Federal agency actions, were confronted with a difficult choice -- to comply without question to Government regulatory enforcement which they believed improper, or challenge the Government, often at a cost exceeding the fine or penalty imposed.").

-41-

Act.  It imposes on United States Citizenship and Immigration Services ("USCIS") the costs of plaintiff's attorneys' fees when the agency at all times acted in accordance with the law.  It also imposes such costs on the agency for attempting to resolve the matter by agreement and withdrawing the issue from the court and back to the agency so that the agency could give the relief the plaintiff sought.  It also has the practical effect of draining resources from an agency which is already struggling to do its job.

## I.

In my view, plaintiff is not a prevailing party.  A party is prevailing for EAJA purposes if there is a material alteration in the party's position that bears a "judicial imprimatur." Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res., 532 U.S. 598, 604-05 (2001).  In Buckhannon, the Supreme Court noted two specific ways in which a party can prevail: by obtaining a judgment on the merits or a consent decree in its favor.  Id. at 605.  Other circuits have read Buckhannon as allowing parties to prevail if they receive the equivalent of a consent decree or some other form of judicial relief that both affects a material alteration and bears a judicial imprimatur.  See Smith v. Fitchburg Pub. Sch., 401 F.3d 16, 23-24 (1st Cir. 2005).  This circuit has not taken a position on the issue.  Id. at 23.

The majority focuses on the first situation, asking "whether the district court's order was the functional equivalent

of a consent decree."  The majority distinguishes this circuit's decision in Smith on the ground that Smith was not concerned with whether the orders in question were the equivalent of a consent decree.  However, as in Smith, here the question of whether the order was the equivalent of a consent decree was not raised by either party, nor was that the theory on which the district court relied.  Thus the issue was waived.  Id. at 24 (the issue is waived if not presented by the parties).  Instead, the parties and district court focused on the second situation: whether the district court's order put the necessary judicial imprimatur on the change in Aronov's legal status.  The majority should not create arguments the parties and the district court did not use, nor do so to justify its result.

But even if the issue had not been waived, the district court's brief order remanding the case is not the equivalent of a consent decree.  The order contains no statement incorporating an agreement between the parties or requiring that either party act in a particular way.  All the order does is to remand the case at the request of the agency.  The order here thus differs from the ones cited by the majority which other circuits have found to be the functional equivalent of consent decrees.  See, e.g., Carbonell v. INS, 429 F.3d 894, 897 (9th Cir. 2005) (district court incorporated parties' stipulation into an order); Truesdell v. Phila. Hous. Auth., 290 F.3d 159, 162 (3d Cir. 2002) (district court order

-43-

included detailed terms of parties' settlement); Am. Disability Ass'n v. Chmielarz, 289 F.3d 1315, 1317 (11th Cir. 2002) (parties' settlement was "approved, adopted, and ratified" by the district court in an order where the court expressly retained jurisdiction).

As the Supreme Court has made clear, the distinction is material: "The situation would be quite different if the parties' obligation to comply with the terms of the settlement agreement had been made part of the order . . . ." Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 381 (1994). It is quite clear that a "judge's mere awareness and approval of the terms of the settlement agreement do not suffice to make them part of his order." Id.

I would hold that the district court's order lacks the necessary judicial imprimatur to entitle Aronov to prevailing party status. Our circuit precedent in Smith requires that result. The majority's treatment of the order as the functional equivalent of a consent decree is inconsistent with our holding in Smith.[22] That case involved an administrative hearing officer's pre-hearing orders, some of which were accompanied by the threat of sanctions, which "memorialized the voluntary concessions made by [defendant] and attempted to keep the settlement process moving forward in a

---

[22] The majority also suggests that Smith is somehow different because the orders in question came from an administrative hearing officer rather than a district court, but Smith lends no support to that proposition.

timely manner." Smith, 401 F.3d at 26. We held that these orders, although they imposed specific requirements on defendant, did not have sufficient judicial imprimatur to make plaintiff a prevailing party because they simply made defendant "follow through with what [defendant] had already voluntarily promised to do." Id. at 27. That is exactly the case here. The district court's remand permitted USCIS to follow through with its announced intention to make Aronov a citizen by November 8, 2006. USCIS had voluntarily agreed to do so before it requested the remand. As in Smith, the remand may have kept the process moving in a timely manner, but that is not enough to make Aronov a prevailing party. His claim under the EAJA should have stopped there.

II.

I also disagree with the majority that the government's pre-litigation position was not substantially justified.

The Supreme Court has interpreted the "substantially justified" language in the EAJA: "[A]s between the two commonly used connotations of the word 'substantially,' the one most naturally conveyed by the phrase before us here is not 'justified to a high degree,' but rather 'justified in substance or in the main' -- that is, justified to a degree that could satisfy a reasonable person." Pierce v. Underwood, 487 U.S. 552, 565 (1988); see also, e.g., Schock v. United States, 254 F.3d 1, 5 (1st Cir. 2001); Dantran, Inc. v. U.S. Dep't of Labor, 246 F.3d 36, 40-41

(1st Cir. 2001).  The government's position is substantially justified if required by law.  See Dantran, 246 F.3d at 41; United States v. One Parcel of Real Prop. With Bldgs., 960 F.2d 200, 208-09 (1st Cir. 1992).  That was true here.

The government's position may be substantially justified even if its reasonable interpretation of its legal obligations is not ultimately affirmed by a court.  Schock, 254 F.3d at 5.  This court earlier reversed a district court for abuse of discretion in granting attorneys' fees when the government "was at least reasonable" in denying a visa because it wanted to "communicate the attitude of the United States government toward the activities of the Soviet Union," even though the visa applicant's interpretation of the underlying law ultimately prevailed.  Allende v. Baker, 891 F.2d 7, 12, 13 (1st Cir. 1989); see also, e.g., Li v. Keisler, 505 F.3d 913, 920 (9th Cir. 2007) ("In the absence of guidance from this court, the government's position was substantially justified."); Bricks, Inc. v. U.S. EPA, 426 F.3d 918, 924 (7th Cir. 2005) (although EPA was unsuccessful in its attempt to show a hydrological connection, it was still substantially justified in doing so).

Here, the government argues that USCIS's pre-litigation position was substantially justified because that position was taken pursuant to federal law.  In particular, the government points to two congressional enactments with which it has complied

-46-

here. The first is 8 U.S.C. § 1446(a), which provides that "[b]efore a person may be naturalized, an employee of the [USCIS], or of the United States designated by the Attorney General, shall conduct a personal investigation of the person applying for naturalization." The second is language included by Congress in the 1998 Appropriations Act which has continuing effect: "[D]uring fiscal year 1998 and each fiscal year thereafter, none of the funds appropriated or otherwise made available to [USCIS] shall be used to complete adjudication of an application for naturalization unless [USCIS] has received confirmation from the Federal Bureau of Investigation that a <u>full criminal background check</u> has been completed . . . ." Dep'ts of Commerce, Justice & State, The Judiciary & Related Agencies Appropriations Act, 1998, Pub. L. 105-119, 111 Stat. 2440, 2448-49 (1997) (8 U.S.C. § 1446 note) (emphasis added).

The majority faults USCIS for interpreting the phrase "full criminal background check" to include a FBI name check. In the end, the award here turns on the majority's view that USCIS did not need to include the FBI name check as part of a "full" check, and that the agency's compliance with its name check policy renders its pre-litigation position here (to await the results of a requested name check) not substantially justified. But the agency's policy and its pre-litigation decision to comply with its policy were entirely reasonable.

The question before us is not whether the language in 8 U.S.C. § 1446 and the 1998 Appropriations Act specifically requires that FBI name checks be part of the background check on citizenship applicants, but whether the agency's interpretation of these statutes as requiring FBI name checks to fulfill its statutory responsibilities renders its position not substantially justified. The position is substantially justified because it was a reasonable interpretation of a legislative command[23] and that interpretation was committed to the agency's expertise.

Principles of administrative law require that courts defer to reasonable interpretations by agencies of matters committed to the agency's expertise by Congress. Chevron U.S.A. v. Natural Res. Def. Council, 467 U.S. 837, 842-43 (1984); Global NAPs, Inc. v. Verizon New England, Inc., 505 F.3d 43, 47 (1st Cir. 2007). Agencies are also entitled to deference with respect to policy determinations. Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971); Global NAPs, 505 F.3d at 47; Associated Fisheries of Me., Inc. v. Daley, 127 F.3d 104, 109 (1st Cir. 1997) ("[P]olicy choices are for the agency, not the court, to

---

[23]    The majority says that the government has presented no argument that Congress intended that USCIS use the FBI name check. That reasoning puts the cart before the horse.  The broad language used by Congress lets the agency determine how best to perform a full criminal background check and does not limit the agency to a particular type of check.   There is no evidence, textual or otherwise, that Congress intended to require the agency not to use FBI name checks.

make. Even if a reviewing court disagrees with the agency's conclusions, it cannot substitute its judgment for that of the agency."). We also note that we are describing a consistent USCIS interpretation and practice, not one adopted for purposes of the issues in this attorneys' fees litigation.

USCIS, not the majority, has the expertise to determine what should constitute a full criminal background check. The concern that applicants be adequately vetted before they become citizens has taken on added urgency in an age where terrorism is a reality and a continuing threat. That the agency came to decide in 2002 that the inclusion of FBI name checks provided better full criminal background investigations only undercuts the majority's position.

The majority holds that although a court might ordinarily defer to USCIS's policy of using FBI name checks to fulfill its statutory mandate to complete background investigations on citizenship applicants, here we cannot do so because the agency contravened 8 U.S.C. § 1447(b). The statute permits a citizenship applicant to file suit in federal district court if USCIS fails to adjudicate his application within 120 days of conducting an initial examination. The majority places great weight on this provision, treating it as a "statutory mandate" that the agency must adjudicate an application within 120 days of an initial

examination. That is plainly not what the statute says. It says only that suit may be brought within 120 days of the examination.

The provision's legislative history discusses the importance of eliminating delays but says nothing about imposing a deadline on the agency, only that after 120 days relief can be sought in federal court. See 135 Cong. Rec. H4539-02, 4542-43, 1989 WL 182156 (daily ed. July 31, 1989). Thus the authorization to file suit in district court is meant to encourage the agency to act fast, but that does not mean that Congress meant to impose a strict deadline on the agency. Indeed, if Congress wanted to impose a strict deadline, it could have done so directly. It is true that the agency's regulations suggest that it treat the 120-day provision as an internal deadline, see 8 C.F.R. § 335.3(a), but that does not create a "statutory mandate." The statute simply governs the timing of suits.[24]

Corresponding with its view that 8 U.S.C. § 1447(b) creates a mandate, the majority suggests that the government would

---

[24] Additionally, the cases the majority cites for the proposition that the statute creates a deadline involved different questions. United States v. Hovsepian, 359 F.3d 1144 (9th Cir. 2004), was concerned with the question of whether exclusive jurisdiction rests in the district court after 120 days, and it provided no analysis or support for its observation that § 1447(b) "requires the INS to make a decision . . . within 120 days." Id. at 1161. Walji v. Gonzales, 500 F.3d 432 (5th Cir. 2007), involved the question of when the 120-day period begins to run and used the language "the statute is violated in situations such as [petitioner's]" in the context of supporting its conclusion that the 120-day period applies from the time the examination, and not the entire background check, is completed. Id. at 439.

have to make a very strong showing in order to justify missing the 120-day mark.  It also faults the government for not advancing a "particularized justification" regarding Aronov and why a name check was necessary for him.  In my view both rationales are wrong on their own terms and both miss the point.

Even reading the statute as imposing a deadline on the agency, the majority is nonetheless wrong because there is nothing to say that 8 U.S.C. § 1447(b) was meant to trump the agency's obligations to see that an applicant meets the requirements for citizenship or to trump the agency's mandate to conduct a full criminal background check.

Here the agency made a mistake by conducting Aronov's initial examination before it had completed his background investigation, including obtaining the results from the FBI of his name check.[25]  Bureaucracies make mistakes.  Given this mistake, the relevant question is whether it was unreasonable for the agency to proceed with the name check even though doing so meant that Aronov could pursue relief in federal court because of the 120-day provision.

I would hold that it was not unreasonable for USCIS to miss the 120-day mark in order to complete a name check before granting Aronov citizenship.  No "particularized justification" is

_____

[25]    There is no question that doing so was an error.  <u>See</u> 8 C.F.R. § 335.2(b).

-51-

necessary because the entire point of conducting name checks is that the government does not know what the check will uncover. As USCIS has stated,

> Although these security checks may require a more lengthy processing time, USCIS believes that performing them is essential to identifying national security and public safety concerns that would not have been uncovered by other means. This is particularly true given that in[] a few cases, the information obtained from the FBI through this process has reflected very significant issues and risks. FBI name checks disclose information to USCIS that is otherwise not available. . . . USCIS is committed to effective background checks, and thus is committed to the FBI name check.

USCIS, Response to the Citizenship and Immigration Services Ombudsman's 2006 Report, at 10, available at http://www.dhs.gov/xlibrary/assets/USCIS-Response-Ombudsman-06-Report-May-2007.pdf.

Moreover, as the majority points out, although USCIS recently eliminated the name check requirement for visa applicants in order to lessen its backlog, it has not done so for citizenship applicants for the very sensible reason that once a person is granted citizenship, that decision is not easily reversed. There is nothing unreasonable about USCIS's decision to postpone a decision on Aronov's application for citizenship until obtaining information about whether the name check revealed risks to national security or public safety, even if doing so meant that a decision could not be reached within 120 days of his examination.

Indeed, the case law also provides no basis for the award here.  USCIS's pre-litigation position in this case bears no resemblance to pre-litigation positions that courts have found not to be substantially justified.  In <u>Healey</u> v. <u>Leavitt</u>, 485 F.3d 63 (2d Cir. 2007), the Second Circuit held that the government's pre-litigation position was not substantially justified when the government "failed to offer any justification for the Secretary's failure to require [home health agencies] to provide written notice of the termination of benefits."  <u>Id.</u> at 67.  Here the agency points to statutes forbidding it to grant citizenship before certain actions are taken.  In <u>Sierra Club</u> v. <u>Secretary of Army</u>, 820 F.2d 513 (1st Cir. 1987), this court held that an agency's refusal to prepare an environmental impact statement for a project was unreasonable when there was significant evidence that the project required one and several other federal agencies had advocated for one and warned that one might be legally required. <u>Id.</u> at 519-20 (citing <u>Sierra Club</u> v. <u>Marsh</u>, 769 F.2d 868, 874-75 (1st Cir. 1985)).  Here, the agency did not act contrary to law, but according to its reasonable interpretation of the law.

### III.

The majority opinion will, in my view, have a number of unfortunate consequences.  The majority holds that the government, by acting reasonably and requesting a remand so that it could grant Aronov citizenship, exposed itself to liability under the EAJA

because Aronov necessarily became a prevailing party once the court granted the remand. This will discourage USCIS from acting to resolve these cases in a similarly efficient and amicable way in the future. The majority also says that it would be very difficult for the government to show that it was substantially justified in missing the 120-day mark to act on a citizenship application. The majority would thus discourage USCIS from conducting investigations of applicants that could turn up important information but would require longer than 120 days after the applicant's examination for the agency to make a final determination. Ultimately the decision could be contrary to the interests of applicants because in the face of incomplete information, the agency might choose the safer course of denying citizenship.

I respectfully dissent.